## Youngs and others *vs.* Ransom and Youngs.

It is not a ground of objection to the calling or settling of an individual as rector of a Protestant Episcopal parish, that his salary was not fixed by a vote of the congregation, according to section 8 of the act to provide for the incorporation of religious societies.

That provision of the statute has no application to congregations of that denomination.

If a vestry possess the power to settle a minister and fix his salary, a call, made by the wardens and a majority of the vestry addressing a written invitation to an individual to become their rector, and fixing his salary, followed by acceptance, and by mutual action and acknowledgment of its validity and of the relation thus created, cannot afterwards be disregarded or denied.

A call to a parish, and its acceptance and a consequent entry upon the duties of the office of its minister, are all which we have, in this country, resembling the presentation, admission and induction of the English church; and neither these terms, nor the ceremonies indicated, are known to our law as applicable to any of our churches.

The congregation, in the manner indicated by the law of the land, and, in the case of Episcopal churches, by their vestry, call a clergyman to exercise his functions in their parish, and fix his compensation. If he accepts the call and enters upon his office, there is no ceremony which is required or can be performed, to add force or efficacy to these mutual acts, unless it be by reason of some special requirement of the discipline of a particular church. "Induction," in the sense in which it is used in English ecclesiastical law, cannot be employed here.

If every other requisite for the due and proper settlement of an individual as rector of a parish is complied with, the absence of the ceremony of "institution" will not prevent his being such; unless that is the positive rule of the ecclesiastical body to which he and they belong.

There is no such thing known to our law, as institution or induction; and the ecclesiastical law of England is no part of the law under which we live.

The effect or necessity of what is called "institution," depends upon the customs and regulations of the Episcopal church; and is therefore a question of fact, and not of law.

Before our courts can take notice of the customs of a particular denomination or body of christians, or their nature or effect, or of any rights or disabilities resulting from their observance or neglect, the existence of the customs must be properly averred, and proved, as matter of fact.

When a minister is called to, and settled in the charge of, an Episcopal parish, unless something to the contrary is distinctly expressed in the call and settlement, he cannot be dismissed without his consent, except by the bishop of the diocese.

The rule or regimen of the Episcopal church, as to the tenure of its parish

Youngs *v.* Ransom.

ministers, is, that when they have once been placed in charge of congrega-
tions, they can neither leave nor be dismissed, except by mutual consent,
without the intervention of the bishop. *Per* EMOTT, J.

A court of equity will not interfere by injunction to eject a clergyman from
his possession of the church and to forbid his preaching in it, where he is
in office, placed there originally by the act of the parish, and claiming to be
rightfully there, and there is no other person claiming the office, or with
whose rights as a minister of the parish the defendant is interfering; and
where there is no occasion for a breach of the peace, or a conflict between
two clergymen or their adherents, in conducting the worship of the con-
gregation.

APPEALS by the plaintiffs from three orders made at a special term. The facts appear in the opinion of the court.

*By the Court,* EMOTT, J. The defendant Ransom is a minister of the Protestant Episcopal church, and is in the actual discharge of his functions in the parish of Christ Church, Oyster Bay, claiming to be the rector. The other defendant, Youngs, was treasurer of the corporation in 1858, and claims that he still holds the office, in consequence of the alleged invalidity of the election of a successor, which was made in the year 1859, at a meeting of the vestry, which the rector refused to attend. The action is brought by the plaintiffs, who are the wardens and vestrymen of the parish, for an injunction to prevent the defendant Ransom from officiating in the church, from interfering with the vestry in the control or use of the church, from erasing, destroying or concealing the parish register, and from receiving any money from the defendant Youngs, as treasurer of the parish; for a similar injunction to prevent the defendant Youngs from aiding the defendant Ransom in officiating or acting as rector, and from interfering with the plaintiffs, or paying any money to Ransom out of the funds of the parish. The complaint also asks for a judgment directing the defendant Youngs to surrender his office to his successor, and to deliver to him all books and moneys in his hands.

Youngs *v.* Ransom.

The acts which are alleged in the complaint to be done or threatened by the defendant Ransom, are his refusing to leave the parish, claiming and threatening to be and continue to act as rector, insisting that neither the last annual election nor the subsequent vestry meetings were legal or valid, in consequence of his absence, and because certain persons who participated had ceased to be members of the church or parish, and his erasing the names of sundry such persons from the list of communicants in the parish register. It is alleged that the defendant Youngs refuses to render an account, or deliver the books and papers of the church to the person appointed in his place by the plaintiffs; that he has sued the sexton for collections in his hands; and that he threatens to continue to act as treasurer, and to pay to the defendant Ransom his salary. And both defendants are charged with assuming to rent, and with having rented, certain pews in the church.

The ground upon which Mr. Youngs' right to act as treasurer is denied has already been indicated. The reasons for which it is contended that Mr. Ransom is not the rector, appear from the complaint to be that he was not regularly called; that his salary has never been fixed by a vote of the congregation; that he has never been "instituted" or "inducted;" that he has been dismissed, and finally, that he has resigned.

Upon the complaint, together with voluminous affidavits which accompanied it, a temporary injunction was granted by the county judge of Queens county. By the injunction the defendant Joseph Ransom was forbidden to officiate in the church, to interfere with the wardens and vestry in its use, and to erase or mutilate the parish register or any other book or property of the church. The defendant Youngs was forbidden to aid Mr. Ransom in so officiating, and both defendants were forbidden to let pews, or collect rents or revenues. This injunction was granted on the 9th of July, 1859. The defendants put in an answer and gave notice of a motion, for the August special term in Kings county, to dissolve the injunction. Subsequently, on the 18th of July, the defendants

obtained from the county judge, ex parte, a modification of the injunction, so that the defendant Ransom was permitted to use and officiate in the church until the first of August, when the motion to dissolve the injunction could be heard. After this the plaintiffs applied to one of the justices of this court, ex parte, and obtained an order suspending the modification of the original injunction until the farther order of the court, and directing the defendants to show cause, on the first Monday in August, why it should not be vacated.

The defendants, under the advice of their counsel, disregarded this order and opened and held service in the church, as they were allowed to do by the county judge's order modifying his injunction. The plaintiffs then moved for an attachment against the defendants for so doing, and also to set aside the last order of the county judge, and the defendants moved to dissolve the injunction. Both motions of the plaintiffs were denied, and the defendants' motion to dissolve the injunction granted. The plaintiffs have appealed from each order.

There is no material dispute in regard to the facts. In January, 1852, a call or invitation to become rector of the parish was made to Mr. Ransom, in writing, signed by the wardens and a majority of the vestry, fixing the salary at $500, which was subsequently increased by a vote of the vestry to $600. During the same month this was accepted, in writing, and soon afterwards Mr. Ransom moved to Oyster Bay and entered upon the discharge of the duties of rector or minister in the parish. He has acted as rector in every particular until the present controversy arose; his election was certified to the convention of the diocese of New York in September, 1852, and he took his seat in the convention, by virtue of that certificate, and has since held it. The call does not appear to have been made by a formal vote of the vestry as a body, but by their signing the paper already referred to. But the proceeding was subsequently ratified by the vestry, by recording the acceptance, if not the call, upon their minutes, and by recognizing the defendant as their presiding officer and

the rector of the parish, and by fixing his salary as such. There can be no doubt that if a vestry possess the power to settle a minister and fix his salary, a call made by such a body in this manner, followed by mutual action and acknowledgment of its validity and of the relation thus created, could not afterwards be disregarded or denied.

It was strenuously insisted that the defendant Ransom was not duly called or settled as the rector of this parish, because his salary was not fixed by a vote of the congregation, according to section 8 of the act to provide for the incorporation of religious societies, which it is contended is applicable as well to Episcopal as to other churches and societies. This question came before Vice Chancellor McCoun in the case of *Humbert v. St. Stephen's Church,* (1 *Edw. Ch. Rep.* 308,) and was carefully considered by him. We fully concur in his reasoning and its result, and we can add nothing to what he has said, except that the uniform practice of Episcopalian churches confirms the correctness of the conclusion that the provision of the statute now in question has no application to congregations of that denomination. It was supposed by the plaintiffs' counsel that this case was overruled by the judgment of the court of appeals in *Robertson v. Bullions,* (1 *Kern.* 243.) But this is altogether a mistake. The questions discussed in that case related to the power of a society or congregation to change their church relation, their doctrine, discipline or worship at the pleasure of a majority, by a vote legally taken and expressed. But this has no bearing upon the question whether the sections of the statute now in question, which were evidently framed for societies of the Presbyterian or other churches, are applicable to those which are organized as Episcopal churches, and continue such. It is no doubt in the power of a majority of the corporators of this parish, if they so determine, to convert their church and society into a Prebyterian, a Baptist or a Methodist church, without forfeiting the property held by the corporate body. But as long as they continue an Episcopal church, their officers and people possess the pow-

ers and are under the restrictions which the statute imposes upon that class of corporations and no others. What these powers are, depends upon the construction and application of these statutes, and with this the case of *Robertson* v. *Bullions* has nothing to do.

It is said that Mr. Ransom is not the rector of this parish, because he has never been "instituted" nor "inducted." Both these terms are used in various canons &c. of the Episcopal church in this country, without always an apparent attention to the difference in their meaning in the country from which they are derived. In England the parson of a parish, which Blackstone says is the most legal and most honorable appellation a parish minister can have, or the incumbent of any benefice, upon being fully admitted thereto, acquires legal rights as well as prerogatives of a merely clerical character. The acquisition of the full legal title to a benefice in the English church involves several particulars. The patron must present to the living, the ordinary must examine and admit the clerk presented, and then follow institution and induction. Admission to a benefice, in a general sense, includes institution, but strictly it is the approval of the presentee by the bishop; while institution is the act by which the latter commits to him the cure of the church. Institution more properly refers to the cure of souls, and does not confer upon the clerk a legal title to the glebe, the tithes, or any of the temporalities of the living. (*Burn's Eccl. Law, I,* 153, 154.) To this, induction is necessary, which is a separate ceremony, performed under the mandate of the ordinary, by the archdeacon or other person to whom it is addressed. By this the clerk becomes fully possessed of all the profits of the living and of all his rights as the incumbent. In England, institution and induction are both short and simple ceremonies, and seem to be used rather for the sake of legal strictness and notoriety, somewhat as livery of seisin was made upon a feoffment, than for any supposed spiritual significance. A call to a parish, and its acceptance and consequent entry upon the duties of

the office of its minister, are all which we have in this country resembling the presentation, admission and induction of the English church; and neither these terms nor the ceremonies indicated are known to our law as applicable to any of our churches. The congregation, in the manner indicated by the law of the land, and in the case of Episcopal churches by their vestry, call a clergyman to exercise his functions in their parish, and fix his compensation. If he accepts the call and enters upon his office, there is no ceremony which is required or can be performed to add force or efficacy to these mutual acts, unless it be by reason of some special requirement of the discipline of a particular church. That induction, in the sense in which it is used in English ecclesiastical law, cannot be required or employed here, is sufficiently obvious from a consideration of the different position and rights of clergymen in the two countries. In England, the parson as such has a freehold estate in the glebe, the tithes and other dues of the parish. By induction, he becomes fully invested with these and with the right to sue for and demand them; but in this country there are no such rights or interests into which a clergyman can be inducted. The property of the church, its revenues, its glebe, its parsonage if it have any, its church edifice and the like, belong to the corporation, and the clergyman has no rights or estate in any of them, other than such as are conferred by express contract, except perhaps the control and possession of the church during divine service, as long as the building is retained by the society for that purpose, although even this would rather seem to appertain to the vestry. It is very manifest that the term induction is out of place in this state, at least in any discussion of legal rights.

Similar observations may be made upon the use of the term rector. This appellation has a special meaning in the English church, which has little, if any, bearing upon any prerogatives which the rectors of our parishes claim or possess. If the interpretation of this title, or the inference from its use, contended for by the plaintiffs, be correct, the difference between a rector

and a minister in an Episcopal parish, in this country, would be, that the former is instituted and settled for life, while the latter is removable at the will of the vestry or congregation. Even if this were so, the latter, until removed, would seem to possess all the powers, as he discharges all the functions of the former; and the term rector would be inappropriately applied or refused, according to a difference merely in the term of the office. The truth is that the style rector, although not a remarkably apposite appellation in this country, was probably adopted in the Episcopal church, because the position of their clergy, who are not the substitutes of other incumbents and are directly entitled to the income attached to their places, more nearly resembles that of the rectors in the English church than that of any other class of its clergy. A rector, in England, is the parson of a parish, where tithes are neither appropriate, that is, belonging to some corporation, nor inappropriate, that is, belonging to or granted to some person by the crown, to which a large number of the livings which had been acquired or appropriated by the religious houses were confiscated at the reformation. A very large proportion of the parochial clergy of England, I mean those permanently entitled to benefices, are not rectors, but either vicars or perpetual curates. These are legally and really deputies of the person to whom the revenues of the parish belong, and who is bound, by their receipt, to provide for the maintenance of divine service therein. Their compensation is matter of grant or agreement, or fixed by prescription at a certain proportion of the tithes which by law belong to the appropriator. In the case of a rector he is under no appropriator, but is himself of right entitled to all the revenues of the parish — tithes, dues, or whatever they may be. As in this country of course there is no appropriation of benefices or parochial revenues, the parish clergy may in that sense all be styled rectors, and for this reason probably were so. The title, however, when traced back to its origin and true import, affords no light upon the present question.

But it is insisted that there is a ceremony required in the

Episcopal church before a clergyman can be permanently settled in a parish as its rector—that is, its permanent officiating minister. This ceremony is what is called in the common prayer book of the Episcopal church, "institution."

The term "Institution," in English ecclesiastical law, is applied to the investiture of the spiritual, as induction is to that of the temporal part of the benefice. (1 *Black. Com.* 391.) In the canons or rules of the American Episcopal church it refers to the particular ceremony which I have just mentioned, for which a service is provided in the Book of Common Prayer of that church. The plaintiffs insist that the defendant Ransom is not the rector of the parish, but is merely preaching there until it is the will of the vestry to discharge him, because this service has never been performed in his case in respect to this parish. This is a question which must be decided entirely by the rules and customs of this particular church or denomination. As there is no such thing as induction into the temporalities of the church, and as institution is merely a ceremony by which the charge of souls in a particular parish is committed to a minister with such form and solemnity as is considered appropriate, it does not follow from the nature of the case, and can only result from positive and express rule, canon or custom of this church, if the performance of this service is necessary to give to the incumbent of a parish that tenure which such a custom or rule establishes for its clergy in general. In other words, if every other requisite for the due and proper settlement of the defendant as rector of the parish was complied with, the absence of this ceremony will not prevent his being such, unless that is the positive rule of the ecclesiastical body to which he and they belong.

I have looked into the canons which are cited in Judge Hoffman's learned and laborious work upon the government of this church, and into his commentary upon them, and the practice under them, without finding any reason to adopt such a conclusion. Mr. Hoffman himself expresses very strongly an opposite opinion, (*Hoffman's Church Law*, 291, 293,) and he

is very high authority upon such questions. I shall not go into any detailed examination of the legislation of the Episcopal church in this particular. Upon a careful consideration of Judge Hoffman's argument and of his authorities, I entirely concur in his views of the effect of the use or neglect of this particular service. It is not necessary for the purposes of this case, however, to consider the question in so broad an aspect as he has discussed it.

The only question now before us is the term or tenure of the defendant's office in the parish. This depended upon the contract between him and the parish which was contained in their call or offer and his acceptance, if that contract was specific upon the point, and upon the general rule of the church if the contract was silent. The contract, as evidenced by the call and acceptance, and the subsequent action of the vestry, including their certificate to the bishop or standing committee, contains no specification upon this point. Mr. Ransom was not called, nor did he agree to preach to this church for a year, or any specified time, nor at the will of the church or vestry. He was called to take charge of the parish as rector, and settled as such. It is not and cannot be denied, that the rule or regimen of the Episcopal church, as to the tenure of its parish ministers, is, that when they have once been placed in charge of congregations, they can neither leave nor be dismissed, except by mutual consent, without the intervention of the bishop. Without discussing the power to make, or the propriety of, agreements for the performance of clerical service limited in time, I think it is very clear that when a minister is called or settled in an Episcopal parish without any such limitation, he can only be dismissed, or sever the connection, by mutual consent, or by superior ecclesiastical authority, on the application of one of the parties. The 33d canon of the general convention of 1832 (*see Hoffman's Law of the Church,* 331) is very explicit to this effect. It applies to the case of a minister who is regularly instituted or settled, leaving it to the law or usage of the particular diocese to determine whether any thing

more than settlement shall be required. It is said that the only penalty inflicted upon a congregation for a violation of the canon, is deprivation of its representation in the convention. But this is the only penalty in the power of the convention enacting the canon: the parties must go elsewhere for other remedies or punishments. It is stated in the answer, and such is no doubt the fact, that in the diocese of New York the institution office is seldom observed; and this destroys the effect of some parts of the canon upon this question. The cause of this neglect is not very material; but I apprehend it is a dislike of the form prescribed, or a dislike of the use of any such ceremony, if not absolutely required, which has led to its disuse, and not an opinion that its use will alter the relation between the incumbent and his parish, or the bishop. I have no hesitation in the conclusion, that when a minister is called to and settled in the charge of a parish, unless something to the contrary is distinctly expressed in the call and settlement, he can only be dismissed without his consent by the bishop of the diocese.

The observations which have now been made, dispose of the allegation that the defendant was dismissed from his parish. For after the defendant had been called and settled without any expressed limitation of time, he could not, according to the rules of this church, be dismissed or removed without his own consent, except by the bishop of the diocese. The allegation of a resignation of the church by the defendant may be very briefly disposed of. There is nothing proved in the case which amounted to more than an expression of an intention on the part of Mr. Ransom to resign at some future time. There is no actual resignation *in præsenti,* and the unsuccessful attempts of both parties to this unhappy dispute to obtain the assistance or interference of the bishop, show that no such act was intended or understood.

It should be observed, with regard to the questions which now have been considered, that the question of the necessity or effect of what is called induction or institution in the Epis-

copal church can hardly be said to be properly or at least necessarily before us on these papers.    The right of the vestry of an Episcopal church to call a minister and fix his salary, and the validity of the defendant's call and settlement, depend upon the application and construction of the statute for the incorporation of religious societies, and are directly before us upon the facts stated.    The question of the defendant's dismission depends upon the character and validity of his settlement in the parish.    The allegation that he had resigned is to be tested by an examination of the communications between him and the parish.    But the effect or necessity of what is called institution, is purely a question of the customs and regulations of this particular denomination or body of christians. It is therefore a question of fact and not of law.    There is no such thing known to our law as institution or induction, and the ecclesiastical law of the mother country is no part of the law under which we live.    Before our courts can take notice of such customs, or their nature or effect, their existence should be properly averred and proved as matter of fact.    The canons, rubrics or rules of this or any other church among us, are not laws; they are merely regulations for the conduct of its ministers and members, depending for their force upon the vows of the one and the consciences of the other, so far as they are within the limits of the rightful powers of such bodies.    We know nothing of them judicially.    It is a fatal objection to this part of the plaintiffs' case, that neither the complaint nor the affidavits which accompanied it contain the necessary allegations upon this point.    The complaint merely states that the defendant Ransom was never inducted or instituted, and the affidavits do not add any thing to the complaint in this particular.    There is no statement of what induction or institution is, for what purpose it is used, or to what extent it is considered necessary in the Episcopal church, what is its effect, or how it is performed.    Without such statements of the rules or customs of the Episcopal church, we cannot take notice of

their existence, or of any rights or disabilities which might result from their observance or neglect.

We are also of opinion that this preliminary injunction ought not to have been granted upon the statements of the complaint, against the defendant Ransom, even had the plaintiff been correct in his views of the rights of the defendants. Injunctions have been sometimes granted to stay the acquisition of, or entrance upon, an ecclesiastical office or its profits, by a person not entitled to it, or not lawfully elected or appointed to it. The case of *Humbert* v. *St. Stephen's Church*, (1 *Edw. Ch. R.* 308,) already cited, was a case of this sort. There are also instances in the English courts. (*Ambl.* 98. 1 *Dickens*, 146.) But these cases are not analogous to the one before us. The defendant is in office, placed there originally by the act of the parish, and claiming to be rightfully there. There is no other person claiming the office, or with whose rights as a minister of the parish he is interfering. There is no occasion for a breach of the peace, or a conflict between two clergymen or their adherents in the conduct of the worship of the congregation. The object of our interference is in effect to eject the defendant from his possession of the church and to forbid his preaching in it. We cannot find any precedent for such an interference. His preaching does not establish a right to his compensation or salary, if the plaintiffs are right in asserting that his connection with the parish has been terminated. We cannot discover that it infringes any other legal rights of the plaintiffs or the church, and it is not, certainly, in itself an act which should be forbidden by the injunction of a civil court.

With respect to the renting of pews or collection of rents, there is no allegation in the complaint that either of the defendants is irresponsible, or unable to respond for any moneys belonging to the church which may come to their hands in that way. An ordinary action at law would afford all the redress which is requisite for such a misappropriation of the funds of the corporation. The charge of mutilating the records of the

church relates only to the record of certain persons being communicants in the parish, which does not confer or affect any civil rights whatever, and is therefore unlike the case of a record of marriage, or the like. With respect to the case against the defendant Youngs, there may perhaps be more color for the action, in the complaint, but its equities are fully denied by his answer.

We are of opinion that the injunction was properly dissolved, and that the order vacating it should be affirmed with costs.

We also agree with the opinions expressed by the judge at special term in regard to the motion for an attachment against the defendants, and the order of the county judge modifying his injunction. It is not necessary to discuss these questions at length, as we could add nothing to the views expressed by him. These orders are also affirmed with costs.

KINGS GENERAL TERM, December 12, 1859. *Lott, Emott* and *Brown,* Justices.]